UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOSEPH HENNESSY, )<br><br>Plaintiff. )<br><br>v. )<br><br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social Security, )<br><br>Defendant. ) | No. 4:13 CV 2169 CDP |

## <u>MEMORANDUM AND ORDER</u>

This is an action under 42 U.S.C. §§ 405(g) and 1383 for judicial review of the Commissioner's final decision denying Joseph T. Hennessey's application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*., and his application for supplemental security income under Title XVI, 42 U.S.C. §§ 1381 *et seq*. Hennessey claims he is disabled because he suffers from migraine headaches, major depression, and opiate dependence. After a second hearing, the Administrative Law Judge concluded that Hennessey was not disabled. Because I find that the ALJ's decision was based on substantial evidence on the record as a whole, I affirm.

# I. *Procedural History*

On July 7, 2009, Hennessey filed an application for disability insurance benefits and an application for supplemental security income.  Hennessey initially alleged an onset date of January 11, 2003 but, at the time of his first hearing, amended his disability onset date to September 1, 2007.  After his claims were denied on October 27, 2009, Hennessey requested a hearing before an administrative law judge.  Hennessey then appeared with counsel at an administrative hearing on July 29, 2010.  Hennessey, his social worker, and a vocational expert testified.

After the hearing, the ALJ denied Hennessey's applications, and Hennessey appealed to the Appeals Council.  On December 27, 2011, the Appeals Council issued an order remanding the case to the ALJ.  Hennessey again appeared with counsel at a second administrative hearing on June 6, 2012.  At this hearing, Hennessey, his mother, his social worker, a medical expert, and a vocational expert testified.

After the second hearing, the ALJ again denied Hennessey's applications, and Hennessey again appealed to the Appeals Council.  On August 30, 2013, the Appeals Council denied his request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir.2008).

Hennessey now appeals to this court. He argues that the finding of non-disability is not supported by substantial evidence because the residual functional capacity findings are not supported by "some" medical evidence. Hennessey also alleges that the hypothetical question posed to the vocational expert did not capture the concrete consequences of his impairment and, thus, the conclusions reached by the vocational expert did not constitute substantial evidence.

## II. *Evidence Before the Administrative Law Judge*

### *Medical Records Before Period of Alleged Disability*

On August 1, 2005, Hennessey visited St. Luke's Urgent Care complaining primarily of a stomachache. He reported experiencing ongoing mid abdominal pain, which had recently worsened, and also a history of chronic headaches. The urgent care physician recommended that Hennessey see his primary physician for an evaluation regarding the headache and stomach issues. (Tr., pp. 663–69).

Hennessey was brought by ambulance to Mercy Medical Center on October 25, 2006 with suspicion of overdose on heroin, and was admitted and treated by Dr. Peter Zhang. He reported using heroin intravenously for two or three years and using marijuana in the past at age seventeen. He further reported feeling depressed since losing his job at CitiMortgage, and feeling particularly badly the previous night when he used more heroin than usual. Dr. Zhang noted, however, that Hennessey denied any suicidal ideations, insisting that he did not intend to kill

himself the previous night. Instead, Hennessey asserted that he had been having anxiety attacks, but was feeling much better. Dr. Zhang encouraged Hennessey to seek chemical dependency treatment, but noted that he did not seem motivated for or interested in such treatment. Dr. Zhang also discussed with Hennessey the relationship between substance use and anxiety symptoms. Dr. Zhang diagnosed Hennessey with heroin dependence and assessed a GAF score of 60.[1] (Tr., pp. 410–15, 420, 424–45, 428).

### Medical Records During Period of Alleged Disability

March 20, 2009, Hennessey visited St. Luke's Urgent Care complaining of a headache. He reported ongoing headaches for one year, but stated that this particular headache was the worst yet; rating his pain as a maximum ten on a one-to-ten scale. The urgent care physician prescribed Fioricet and Valium, noting his clinical impression that Hennessey was suffering from a migraine. (Tr., pp. 436–38, 443).

On February 9, 2009, Hennessey began visiting Dr. Susan Minchin for depression, anxiety, and migraines. He reported experiencing anxiety or panic attacks two or three times a week and stated that Xanax helped with his anxiety. He also reported feeling "blah" all the time and stated that no medications had

---

[1] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.*

been helpful for his depression. In addition, Hennessey reported that he lived with his parents and had a two-month-old son with his girlfriend. (Tr., p. 572).

Hennessey again visited Dr. Minchin on April 20, 2009. He reported panic attacks during the previous two weeks and stated that his migraines were unchanged, occurring three or four times a week. He further reported having low energy and a "blah" mood. (Tr., p. 573).

At his May 12, 2009 appointment with Dr. Minchin, Hennessey reported recently having a few good days, stating that his depression was a little better and that he had been spending more time with his son. Dr. Minchin prescribed Deplin and Fioricet in addition to the Restoril, Xanax, and Gabapentin she had previously prescribed Hennessey. (Tr., p. 574).

Hennessey visited Dr. Minchin again on June 11, 2009, reporting severe all-day headaches and increased feelings of hopelessness and anxiety. However, he indicated that his migraines benefit from Gabapentin and also stated that he continued to spend thirty to forty hours a week caring for his son. Overall, Hennessey reported no improvement from his initial appointment with Dr. Minchin. (Tr., p. 575).

On July 20, 2009, Hennessey again visited Dr. Minchin. At this appointment, he complained of lethargy, which caused him to spend most of his time in bed, "pretty bad" headaches, which occurred all day every day, and panic

attacks. He reported that Gabapentin had stopped working and also that he had been spending less time caring for his son. Dr. Minchin's assessment was that Hennessey had experienced no improvement and she instructed him to discontinue Gabapentin. (Tr., p. 576).

Hennessey returned to Dr. Minchin's office on August 20, 2009. He reported uncontrollable migraines, but stated that Fioricet takes the edge off, and also requested Adderall for attention deficit disorder. Hennessey reported that he was starting school the following week and would take an eight credit-hour course load. Dr. Minchin's assessment was that Hennessey was still depressed. She prescribed Hennessey Gabapentin, MAOI, and another medication, and instructed him to discontinue Deplin and Restoril. (Tr., p. 577).

Hennessey again visited Dr. Minchin on September 14, 2009, complaining of depression, low energy, and migraines. He reported attending school two days a week, working fifteen to twenty hours a week, and "doing what is expected of me" in regard to caring for his son. Dr. Minchin noted her assessment that Hennessey was suffering from depression. She again instructed him to discontinue Gabapentin, and also suggested he try Excedrin Migraine. (Tr., p. 578).

On November 22, 2009, Hennessey returned to Dr. Minchin. At this appointment, he reported that he had been attending his classes but had quit his job after one month. Dr. Minchin noted that Hennessey had discontinued one

prescription medication on his own because he believed it was no longer working. Dr. Minchin also noted that Hennessey's affect was dysphoric. She prescribed Adderall and also assessed Hennessey as depressed. (Tr., p. 579).

Hennessey again visited Dr. Minchin on January 22, 2010, reporting low mood and energy. He reported that he was still attending school and stated that he sometimes enjoyed it. Dr. Minchin's assessment was that Hennessey was still depressed. She discontinued Restoril, noting that Hennessey had not been using the medication. (Tr., p. 580).

On March 18, 2010, Hennessey returned to Dr. Minchin. He reported that his mood was about the same with good and bad days that were roughly equal in number. Hennessey also reported that his migraines were unchanged and that his energy level had increased after taking a new prescription. He indicated that school was going well and that he was not presently working. Overall, Dr. Minchin noted her assessment that Hennessey's symptoms had improved. She discontinued Adderall. (Tr., p. 581).

Hennessey was admitted to the Emergency Department at Barnes Jewish Hospital on April 1, 2010 after arriving by ambulance. He complained primarily of syncope or fainting, reporting that he had experienced two such episodes. Hennessey also complained of symptoms related to withdrawal from heroin. Dr. Svancarek noted that Hennessey had been abstinent from heroin for two days and

was currently in a treatment program. At discharge, Dr. Panagos diagnosed Hennessey with contusion, syncope, and dehydration. (Tr., pp. 512, 515–16, 519–21, 523–24, 526–31).

Hennessey was admitted to Metropolitan Psychiatric Center on April 5, 2010 and discharged on April 13, 2010. During that time, he was treated by Dr. Ujjwal Ramtekkar and Dr. Devna Rastogi for persistent depressive symptoms and suicidal thoughts. The physicians noted that Hennessey presented with a history of heroin dependence, major depressive disorder, at least two prior psychiatric hospitalizations, and at least four non-medically serious suicide attempts. However, they indicated that his presentation was complicated by heavy drug use, including primarily intravenous heroin use. According to treatment notes, Hennessey had recently received drug rehabilitation treatment after an Emergency Room visit for heroin intoxication. He reported experiencing persistent depressive symptoms, repeated suicidal ideations, and auditory hallucinations while undergoing rehabilitation treatment. Hennessey also reported certain anxiety symptoms including continuous worrying, feeling anxious about nonspecific issues, and feeling breathless during episodes of anxiety. However, it was noted that he did not have any symptoms suggestive of classic panic attack. (Tr., pp. 559–63).

While admitted at Metropolitan Psychiatric Center, Hennessey met with a psychologist on a daily basis. Overall, he reported significant improvement in his depressive symptoms, with complete resolution of his suicidal ideations. At one appointment, though, he stated that he did not want to live and did not have a specific plan to commit suicide "only because there is no practical way to do it here." At that appointment, the physician found that Hennessey's depression was primarily attributable to his substance abuse. It was also noted that during his stay Hennessey showed improvement in his sleep, appetite, and energy levels. Hennessey was found to be vocal, verbal, and laughing with some other residents at the hospital. However, he was observed to be exaggerating his depressive symptoms during interactions with the physicians and psychologist. The physicians further noted that Hennessey showed significant improvement in his affect, with euthymic affect and good reactivity observed most of the time. At one point, Hennessey was found to be collecting his pain medications and, when confronted, reported that he planned to use them collectively to get high. Hennessey denied any suicidal plans involving overdose on the pills and was thereafter compliant with his medications. (Tr., pp. 559–60, 564, 566, 571).

Hennessey was discharged from Metropolitan Psychiatric Center on April 13, 2010. He was provided resources regarding drug rehabilitation and reported that he was planning to join an outpatient rehabilitation program. Hennessey also

underwent a mental status examination on the date of discharge. At this appointment, the physicians noted that his mood was much better than before and his affect was euthymic and stable. Hennessey denied any suicidal ideation, plan, or intent. He also denied any auditory hallucinations at the time of examination, but reported having intermittent hallucinations during the evenings. The physicians noted that Hennessey showed good future planning, as he discussed obtaining a job related to his interest in computers as well as resuming school. The physicians' discharge diagnoses included depressive disorder recurrent severe with psychotic features, dysthymic disorder, opiate dependence in early partial remission, personality disorder not otherwise specified, and migraines. They assessed a GAF of 45–50[2] and prescribed Cymbalta and Seroquel at discharge. (Tr., pp. 566–71).

On April 30, 2010, Hennessey began attending appointments at BJC Behavioral Health, including meetings with social worker Brad Peters. Hennessey underwent a clinical intake evaluation on this date, reporting severe depression and related symptoms such as low mood, sadness, and amotivation. Hennessey also discussed his ongoing suicidal ideations and history of four prior suicide attempts, but denied any current suicidal plan or intent. Other symptoms and conditions

---

[2] A GAF score of 41 to 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.*

were also reported, including anxiety, auditory hallucinations, social isolation, migraines, history of heroin dependence, and difficulty paying attention. Hennessey stated that he had lost jobs in the past because of behavior problems or frequent absences and also reported that he attended junior college for four semesters, but did poorly in his courses because of a lack of motivation. The physician noted that Hennessey's compliance with mental health and substance abuse treatments had been variable. Hennessey reported, however, that both conventional and alternative treatments had been ineffective. The clinical opinion stated that Hennessey's depression and substance abuse had been barriers for him to work and be a parent to his son. Hennessey was diagnosed with opiate dependence, major depressive disorder recurrent severe with psychotic features, and migraines, with a current GAF of 38[3] and a previous GAF of 50. (Tr., pp. 584–87).

Hennessey again attended an appointment at BJC Behavioral Health on May 17, 2010. He met with psychiatrist Dr. Scott Cologne and complained primarily of bad mood. Hennessey also reported low energy, low self-esteem, low appetite, anxiety, difficulty paying attention, and auditory hallucinations. Regarding his

---

[3]    A GAF score of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.*

medications, Hennessey reported noncompliance for the past week. His reasons were that Cymbalta made him feel "uncomfortably numb" and Seroquel caused sleep issues and grogginess. Hennessey further indicated that he had remained abstinent from drugs since his last psychiatric hospitalization and that he was attending Narcotics Anonymous meetings almost daily. Dr. Cologne noted that Hennessey's suicidal thoughts appeared to be chronic, although he perceived no present suicidal plan or intent. He diagnosed Hennessey with major depressive disorder recurrent with psychotic features, opiate dependence in early remission, and migraines, assessing a GAF score of 50. He prescribed Remeron and instructed Hennessey to continue NA meetings and outpatient counseling. (Tr., pp. 592–95).

Hennessey returned to BJC Behavioral Health on June 14, 2010 and again met with Dr. Cologne. He reported relapsing on heroin since his previous visit and indicated that he was still experiencing some withdrawal symptoms, although he had not used the drug for eight or nine days. Hennessey also reported that he stopped attending NA meetings and appointments with his psychologist because he did not believe they were helpful. However, he stated that he had been taking his medication regularly, although he had not noticed much benefit from Remeron. Although he expressed hope for finding a job, he reported that his current schedule consisted of watching television. Dr. Cologne noted Hennessey's continued

feelings of depression, low self-esteem, guilt about using heroin, and lack of structure in his daily routine. He recommended individual drug counseling. (Tr., pp. 595–98).

Hennessey again visited Dr. Cologne on July 12, 2010. At this appointment, Hennessey reported relapsing once on opiates the previous week and stated that he had not begun attending drug counseling. Hennessey also discussed various other issues, including his difficulty sleeping, low mood, feelings of depression, and thoughts that he was "better off dead." Hennessey denied experiencing side effects from Remeron, but stated that he felt "head electricity" when he stopped taking the medication for a few days. Dr. Cologne's plan was for Hennessey to continue Remeron, attend drug counseling, and begin taking trazodone for sleep. (Tr., pp. 598–601).

On August 23, 2010, Dr. Cologne indicated that Hennessey had checked himself into a detox program after increasing his opiate usage and experiencing withdrawal symptoms. (Tr., p. 602).

Hennessey again visited Dr. Cologne on February 28, 2011. Dr. Cologne noted that, since his last visit, Hennessey had undergone rehabilitation treatment and had met with addiction specialists. However, Hennessey reported that he did not currently attend NA meetings. Regarding his medications, Hennessey reported that he had been noncompliant with both Remeron and trazodone since August 11,

2010.  He claimed to have experienced no benefits or side effects from these medications.  Dr. Cologne noted that Hennessey understood the medications would have little effect with continued drug use.  Furthermore, Dr. Cologne noted that Hennessey's depressed mood would not be effectively managed with continued drug use and indicated that Hennessey was also aware of this.  Dr. Cologne's assessment was that Hennessey was still using opiates.  His plan was for Hennessey to restart Remeron, take over-the-counter medications for opiate withdrawal, and attend drug rehabilitation.  (Tr., pp. 602–04).

Hennessey returned to Dr. Cologne on March 28, 2011, complaining that his mood was "bleak" and that he felt the same as before.  He also reported feeling anxious around others and claimed he had always felt that way.  Furthermore, he stated that he had been having continued suicidal ideations and regretted waking up each day.  Regarding his medications, Hennessey told Dr. Cologne he had stopped taking Remeron a few days earlier because it was not helping his condition.  Moreover, he reported that he had been taking methadone and Suboxone, which he got "off the street," as well as over-the-counter medications for sleep and headache.  Dr. Cologne's assessment was that Hennessey was not immediately suicidal, but he noted this could change with future drug use, as Hennessey continued to abuse opiates.  Dr. Cologne also noted that there might be

a component of social phobia. He prescribed Clonidine and recommended that Hennessey seek counseling and work on opiate abstinence. (Tr., pp. 605–07).

Hennessey returned to Dr. Cologne on June 27, 2011. At this appointment, he reported an improved mood, stating he felt "much better" as he had met some women who made him happy. He also reported that, although he continued to have trouble sleeping, his appetite had improved and he was no longer having suicidal ideations. Hennessey reported that Clonidine was helpful for dealing with sleep issues and withdrawal, and also mentioned taking more Clonidine than prescribed to help with withdrawal symptoms. Regarding his drug and alcohol use, Hennessey reported no regular opiate use in the past couple of months, but stated that he last used opiates the previous week and had been drinking beer two or three times per week. (Tr., pp. 608–10).

Hennessey visited Dr. Cologne again on August 8, 2011 and reported a good mood, stating that he had been doing well overall since his last visit. Hennessey also reported constant anxiety, but indicated that it was generally manageable. In addition, Hennessey reported relapsing on heroin once or twice since his previous visit and drinking alcohol once a week, typically six or more beers at a time. Hennessey also reported taking Clonidine three or four times a week, but stated that he did not take it during the day because it made him feel groggy. He requested to begin taking Seroquel instead, as it had been helpful for him in the

past at treating mood and sleep issues. Dr. Cologne discontinued Clonidine, prescribed Seroquel, and recommended that Hennessey continue to work on abstinence from alcohol and heroin. (Tr., pp. 611–13).

Hennessey returned to Dr. Cologne on September 12, 2011. At this visit, he reported that his mood was fine, but he still felt that his life was not worthwhile. He reported abstinence from heroin since his last visit and also indicated that he had reduced his alcohol consumption. Also during this visit, Hennessey requested benzodiazepines in place of Seroquel, which had caused him to gain weight without improving his condition significantly. Dr. Cologne discontinued Seroquel and prescribed buspirone. (Tr., pp. 614–16).

Hennessey next visited Dr. Cologne on November 14, 2011, reporting a "better" mood and denying depressive symptoms. Regarding his drug and alcohol use, Hennessey reported relapsing on heroin a few weeks earlier, but stated he had not consumed alcohol in many weeks. He further reported positive results from buspirone, noting that it was more effective at treating his anxiety than previous medications had been, without any side effects. However, he stated that he had run out of the medication approximately one month earlier. (Tr., pp. 617–19).

Hennessey began visiting psychiatrist Dr. Malik Ahmed on February 2, 2012 for depression, anxiety, and drug use. Hennessey reported feelings of depression, including hopelessness and lethargy such that he was unable to do anything. He

also reported anxiety issues and nervousness, stating that he would clam up and get sweaty palms when he had to talk to others.  Hennessey reported that he was not presently on any medication, but had been taking buspirone until his prescription ran out.  Dr. Ahmed noted that Hennessey had suicidal ideations and plans, but no suicidal intent.  He diagnosed Hennessey with major depressive disorder recurrent moderate degree, social phobia, and opioid type dependence unspecified use, assessing a GAF of 50.  Dr. Ahmed prescribed imipramine for social anxiety and recommended that Hennessey stay clean and sober.  (Tr., pp. 644–47).

Hennessey returned to Dr. Ahmed on March 1, 2012, reporting recent suicidal ideations. Hennessey also reported that he had been using marijuana since his last visit.  However, he reported that his mood was better possibly because he was smoking less marijuana than before.  Hennessey also remarked that he felt less anxious and believed the medication was working.  Furthermore, he reported that he had been working three or four nights a week for a t-shirt printing company. Dr. Ahmed increased Hennessey's imipramine dosage.  (Tr., p. 643).

On April 5, 2012, Hennessey again visited Dr. Ahmed.  He reported difficulty sleeping after a breakup with his girlfriend, as well as continued feelings of anxiety and worthlessness.  Hennessey also reported suicidal ideations, though Dr. Ahmed noted an absence of any suicidal plan or intent.  Hennessey next discussed his drug and alcohol use, indicating that he had been drinking some

alcohol but was smoking less marijuana. He also reported that he had been working at the t-shirt printing company nearly forty hours a week. Dr. Ahmed again increased Hennessey's imipramine dosage. (Tr., p. 642).

Hennessey returned to Dr. Ahmed on May 7, 2012 and reported that he was doing okay overall, but noted continued anxiety. According to Hennessey, he had not used drugs in three weeks but had been drinking some alcohol. He also stated that he was working less at the t-shirt store, but had begun working roughly twenty-four hours a week at a cookie stand about three weeks earlier. Hennessey reported having one good week after Dr. Ahmed last increased his medication. Accordingly, Dr. Ahmed again increased the imipramine dosage. (Tr., p. 641).

### Consultative Examination Report

On October 7, 2009, Hennessey underwent a consultative psychological evaluation with psychologist Dr. Lloyd Moore for disability determinations. Dr. Moore noted that Hennessey was a cooperative and fair informant during the evaluation. Hennessey discussed his history of chronic migraine headaches, depression, and social anxiety. He claimed that, as a result of his migraines, he had lost at least three jobs and was also unable to complete more than two years of college. Concerning his drug use, Hennessey reported a past addiction to heroin, which he used as a painkiller for migraines. However, at this point in time, Hennessey was reportedly abstinent from drugs and had been for some time. Dr.

Moore noted Hennessey was currently noncompliant with his Xanax medication, having stopped the medication without consulting his physician. He diagnosed Hennessey with major depressive disorder and social phobia, assessing a GAF score of 60. Dr. Moore found that Hennessey's thought processes, memory, and general fund of knowledge were intact; he was oriented in all spheres; and his judgment and psychological insight were good. He noted that Hennessey could perform his activities of daily living based on physical ability, but was at times unable to do so because of depression. Furthermore, Dr. Moore noted Hennessey's lifelong history of poor ability to develop, maintain, and sustain relationships. He also indicated that Hennessey's concentration, persistence, and pace were negatively affected by his depression. Dr. Moore acknowledged that Hennessey had lost several positions because of his migraines and that he had not been engaged in competitive employment since January of 2009. Finally, Dr. Moore indicated that Hennessey had tried various methods to treat his migraines, but none had been successful. (Tr., pp. 472–76).

### *Psychiatric Review Technique*

Psychologist Dr. Kyle DeVore, a non-examining physician, completed a psychiatric review technique form on October 27, 2009. Dr. DeVore indicated that Hennessey suffered from two medically determinable impairments, major depression and social phobia, that did not precisely satisfy the diagnostic criteria

for affective disorders or anxiety-related disorders.  Dr. DeVore found Hennessey would have mild restrictions in daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of an extended duration.  Dr. DeVore noted that, overall, Hennessey's alleged limitations were only partially credible as they were not supported by a third party's report.  He further noted that Hennessey was capable of performing at least simple work tasks with no public contact.  (Tr., pp. 477, 480–81, 485, 487).

### Mental Residual Functional Capacity Report

Dr. Kyle DeVore also completed a mental RFC assessment on October 27, 2009.  He indicated that Hennessey was moderately limited in his ability to work in coordination or proximity to others without being distracted by them.  He further found moderate limitations in Hennessey's ability to interact appropriately with the general public and his ability to accept instructions and respond appropriately to criticism from supervisors.  Dr. DeVore concluded that Hennessey was capable of performing at least simple work tasks and would do better with no public contact. He noted that Hennessey's alleged functional limitations were partially credible. (Tr., pp. 488–90).

### *Physical Residual Functional Capacity Report*

On October 27, 2009, John Herberger, also a non-examining medical consultant, completed a physical RFC assessment. Herberger indicated "migraine" as Hennessey's primary diagnosis. He concluded that Hennessey had no established exertional, postural, manipulative, visual, or communicative limitations. However, he concluded that Hennessey did have an environmental limitation, as he should avoid concentrated exposure to noise. To support this conclusion, Herberger cited to March 20, 2009 treatments notes from St. Luke's Urgent Care. Hennessey had visited that facility for an abrupt onset migraine and had complained of sensitivity to light and nausea, with pain exacerbated by movement. Overall, Herberger found that Hennessey's allegations regarding his physical limitations were only partially credible as there were inconsistencies between Hennessey's alleged limitations and those described in a third party function report completed by his friend. (Tr., pp. 491–96).

### *Function Reports*

According to Hennessey's function report, which he completed on July 23, 2009, he lived with his family and spent most of his time in bed. He also indicated that he typically spent two days a week helping the mother of his infant son with child care, but explained that he was otherwise in bed and "useless as a parent." (Tr., p. 366). Hennessey reported having the ability to feed himself zero or one

meal a day, although he typically did not feel well enough to do so.  He also explained that he usually showered and shaved once or twice a week and also mowed his yard once a week, but needed reminders to do these things.  Moreover, he indicated that his hobby was working with and building computers, which he could do for hours on end.  Regarding his life outside of his home, Hennessey reported having a valid driver's license and being able to drive alone.  However, he would rarely drive, go outside, or spend time with others. Although he mentioned that he had become asocial since his illness began, he reported having no problems getting along with family, friends, or authority figures.  Hennessey explained that his migraines interfered with his ability to do his normal activities.  Further, his illnesses affected his sleep, memory, concentration, and ability to complete tasks. He was, however, able to follow written and spoken instructions "okay" and handle stress and changes in routine "well enough."  Moreover, he could count change and use a checkbook, but could not pay bills or handle a saving account. (Tr., pp. 366–75).

Melissa Lesniak, Hennessey's friend and the mother of his child, completed a third party function report on August 21, 2009.  She explained that she had known Hennessey for a year and a half and would spend around eight to ten hours a week with him.  During that time, they would watch television, eat dinner, go for walks, and care for their son.  Regarding Hennessey's daily activities, Lesniak

explained that he would sleep during the day, as his illnesses made it difficult for him to sleep at night. He also watched television, read or used the computer. His other hobbies included seeing friends and playing Frisbee, though he rarely saw friends in person anymore. She explained that he would go to her home weekly and to other peoples' homes once or twice a month. According to Lesniak, Hennessey had no problem dressing, bathing, shaving, or taking his medicines, and did not need special reminders to complete these tasks. He did, however, sometimes need prompting to do chores like mowing the yard and washing dishes and also often needed reminders to go to his doctor appointments. Lesniak indicated that Hennessey would prepare himself meals a few times a week, including salads, sandwiches, and noodles, but cooked less often than he did before his illness. Moreover, she reported that he would go outside daily, go out alone, and drive a car. Lesniak believed that Hennessey's illnesses affected his understanding, memory, concentration, and ability to complete tasks and follow instructions. She also reported that, when faced with stress, Hennessey would often isolate himself or get headaches. (Tr., pp. 377–83).

### Work Reports

Hennessey completed a work activity report on July 7, 2009 describing his work since January 11, 2003. He indicated that he worked as a cashier from December of 2002 to February of 2003, but stopped working because the store

closed. He also reported working as a pizza maker for about three months in 2003 and 2004, until he stopped working because he was not getting enough hours. According to Hennessey's report, he also worked as a cook for one month in 2004, but stopped working because of his medical condition and because he had a disagreement with the manager. In addition, he reported that from April 15, 2005 to October 15, 2006 he worked as a loan processor, but he did not report why he stopped working at this job. Hennessey also reported working as a customer service representative during December of 2006, as a cashier and sandwich maker from June of 2007 to September of 2007, and as a dishwasher from October of 2008 to February of 2009. However, he reported that he stopped working at these jobs because of his medical condition. (Tr., pp. 318–328).

### *Testimony at the July 29, 2010 Administrative Hearing*

Hennessey testified at the first hearing before the ALJ on July 29, 2010. He stated that he was born on January 11, 1985, was unmarried with one sixteen-month-old son, and lived with his parents. He would typically see his son a couple of times a week, but would not generally keep him overnight. He testified that he had a twelfth grade education and attended community college for a couple of years after graduating high school. He reported no problems with reading, writing, using a computer, or doing simple arithmetic. (Tr., pp. 33–37).

Regarding his work history, Hennessey stated that he worked as a dishwasher from October of 2009 to January of 2010, but also performed some cleanup duties like moving tables and taking out trash. Before that, he worked at a sandwich shop for a few months in 2008. In 2005 and 2006, Hennessey worked at a bank auditing mortgage files. He testified that he left this job because it was a temporary position and "just ran out." (Tr., p. 39). He also indicated that he worked at a cookie shop during high school for nearly a year, where he baked cookies, ran a cash register, and dealt with customers. Before the cookie shop, Hennessey worked at a toy store as a cleaner, where he would mop floors and empty trashcans, lifting no more than about forty pounds. He also discussed working at a pizza restaurant as a cashier, where he took phone orders and occasionally made pizzas, and at a fast food restaurant as a cook where he prepared burgers. Furthermore, Hennessey worked at a pretzel shop for one day, but testified that he quit because he did not like how he was treated. He also worked for a short time at a telephone kiosk in the mall selling phones and phone service, but reported that he stopped working at this job because his position became redundant after a change in management. (Tr., pp. 37–43).

When the ALJ asked Hennessey to describe the medical conditions that kept him from working, he first discussed his severe migraines. He stated the migraines occurred three to five times a week and lasted several hours, usually requiring him

to sleep them off. Hennessey explained that he had been on and off of medications for migraines since the age of seven, and was currently taking only Excedrin to treat them because his other medications were ineffective and because he could not afford to keep seeing doctors. Hennessey stated that Fioricet had made his migraines less intense, but overall did not help him very much; however, he stopped taking the medication because it was a narcotic and he had issues with substance abuse. He further testified that his migraines affected his full-time work as a mortgage assistant, as he eventually stopped coming to work every day and consequently did not get hired on as a permanent employee. (Tr., pp. 43–44, 52–53).

Next, Hennessey discussed his severe depression, which he testified had also kept him from working. He reported that he had been receiving treatment from psychiatrists and psychologists and taking medications consistently since the age of fourteen or fifteen to treat this condition. When asked if he experienced side effects from his current depression medications, he reported that they made him very sleepy. Regarding his symptoms, Hennessey reported that he had suicidal thoughts and crying spells on a daily basis. He also testified that, for the past couple of years, he did not have the energy to bathe or change his clothes every day and he would only do so every few days after he began to stink and his mother yelled at him. Furthermore, Hennessey reported experiencing auditory

hallucinations on a daily basis that would last a matter of minutes. He stated that he would hear voices telling him "bad things about myself" and "that I have to kill myself." (Tr., pp. 45–46, 55–57).

Hennessey also briefly mentioned in passing to the ALJ that his social anxiety was another condition that kept him from working. (Tr., p. 45).

When discussing his daily activities, Hennessey reported that he did not help around the house. Although he had reported in his application that he mowed the yard, he testified that he no longer did so. He also testified that he no longer used the computer, as he lacked the necessary energy. He stated that he would take care of his child sometimes, but his main activities were lying in bed and watching television. (Tr., pp. 51–52).

Hennessey also answered several questions about his use of tobacco, drugs, and alcohol. He reported that he smoked a pack of cigarettes every couple of days and that he did not drink alcohol, but had in the past. When asked about his use of illegal drugs, Hennessey stated that he had tried drugs such as marijuana and ecstasy, but had mostly used heroin. He reported that the last time he used illegal drugs was about three months earlier, around the time he entered a two-week treatment program. Hennessey testified that, before entering treatment, he used heroin on a daily basis, starting first at the age of eighteen and again in January of 2010 after years of sobriety. When asked if his heroin use affected his ability to

work at his previous jobs, Hennessey reported that it did not, as he was not using heroin at those times.  (Tr., pp. 46–51).

Bradley Peters, Hennessey's social worker, also testified before the ALJ.  He reported that he had been working with Hennessey about once or twice a week since May of 2010, when Hennessey was referred to BJC Behavioral Health for treatment of anxiety disorder, major depression, and opiate dependence.  He explained that his primary objective was to link Hennessey with vocational rehabilitation services, as Hennessey's goal was to get back to work.  Peters stated, though, that Hennessey's social isolation and anxieties had prevented him from working.  He explained that Hennessey was withdrawn, disengaged from conversation, and typically gave one or two word answers to questions with his head down and arms folded.  Peters testified that he and Hennessey were working primarily on organization, mood management, and coordinating medical services. Peters also mentioned that Hennessey's daily activities generally consisted of sitting on the couch, watching television, and occasionally playing on the computer.  Moreover, Peters stated that Hennessey tended to have poor hygiene and unkempt hair.  (Tr., pp. 59–59, 63–65).

When asked about Hennessey's drug use, Peters stated that he believed Hennessey had an addiction.  He also testified that he frequently asked Hennessey when he last used heroin, and Hennessey would respond that he had not used the

drug in a couple of months. Peters believed that before entering treatment Hennessey would use heroin a couple of times a week; however, he was unaware how long Hennessey had been using heroin, and estimated a time period of three to five months. Peters was not aware whether Hennessey was using heroin while working at any of his previous jobs or whether it caused him to leave any of those jobs. (Tr., pp. 59–63).

Vocational expert Delores Gonzalez also testified before the ALJ. Gonzalez stated that mortgage assistant is classified as sedentary semi-skilled work; cookie baker is medium skilled work; dishwasher, sandwich maker, and cleaner are medium unskilled work; retail sales clerk is light semiskilled work; and cashier and fast food worker are light unskilled work. The ALJ asked Gonzalez to consider a hypothetical individual with Hennessey's education, training, work experience, and alleged onset date who could understand, remember, and carry out at least simple instructions for non-detailed tasks; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace. Furthermore, this individual must avoid concentrated exposure to noise and will have absences from work at least three times monthly. Moreover, for the first hypothetical, the ALJ assumed substance use was material. Gonzalez responded that this individual would not be able to perform any past work. When the ALJ changed the hypothetical so that substance use was no longer material and the

individual would not have monthly absences from work, Gonzalez testified that the individual could work as a cashier, sandwich maker, or cleaner. The ALJ next limited the hypothetical to a position where the individual would respond appropriately to supervisors and coworkers in a task-oriented setting and where contact with others was casual and infrequent. Gonzalez responded that such a person could work as an addresser, which was an unskilled position, or as a cleaner. Finally, the ALJ limited the hypothetical again such that the individual would have confrontations with his supervisors or coworkers up to two times monthly. Gonzalez responded that these circumstances "would not allow for the person to maintain employment." (Tr., pp. 65–69).

### Testimony at the June 6, 2012 Administrative Hearing

After the case was remanded by an order of the Appeals Council on December 27, 2011, Hennessey testified again at a second hearing before the ALJ on June 6, 2012. His caseworker, Bradley Peters, his mother, Isolde Hennessey, a medical expert, Dr. James Reid, and a vocational expert, Linda Talley, also testified.

Hennessey's caseworker, Bradley Peters, discussed that he had noticed changes in Hennessey's abilities since July of 2010. He explained that he had observed Hennessey suffering from extreme depression and also going back and forth between acting verbally aggressive and hostile with unstable moods to

withdrawn, reserved, and isolated. Peters testified that, since July of 2010, Hennessey had received psychiatric services and had attended co-occurring group sessions for substance abuse, where he would submit to urine drug screens. He explained that most of these screens had been positive for illegal drugs, at least for marijuana, and that Hennessey had his first negative screen about four weeks earlier. When asked about Hennessey's drug use, Peters explained that he had gone through periods of sobriety but had relapsed since his last hearing. He explained that Hennessey's moods varied from withdrawn to aggressive both when using illegal substances and when going through withdrawal. (Tr., pp. 77–81).

Isolde Hennessey, Hennessey's mother, also testified before the ALJ. She stated that approximately one year earlier Hennessey went through a period of withdrawal and she noticed "extreme, extreme aggressive behavior." (Tr., p. 82). Isolde explained that for about five days Hennessey was curled up in a ball vomiting large amounts of blood, with blood also coming through his nose. She stated that after those five days Hennessey could not eat very well and remained on the couch, weak and sick. Isolde was unaware whether Hennessey was presently using drugs, as she did not know where he went when he left the house. (Tr., pp. 81–87).

When Hennessey testified, he explained that he had been treated for depression, anxiety, and substance use, including detox treatment, since his last

hearing. Hennessey cited debilitating migraines and social anxiety as the main reasons he could not work. Elaborating on his social anxiety issues, Hennessey noted communication issues and stated that he did not get alone well with people. He would have altercations with others on a weekly basis, after which he would typically get frustrated and walk away. He testified that this type of incident had recently caused him to quit his job at a cookie shop after three weeks, when he was accused of baking cookies incorrectly, had a dispute with the manager, and quit. Concerning his drug use, Hennessey reported that he last used heroin in the fall or winter of 2011. He reported that he was probably using heroin three or four times a week in 2011 and daily in 2010, although he could not recall whether he was using heroin in 2007, 2008, or 2009. Hennessey also testified that he had been using marijuana a few months earlier. He stated that his activities included seeing his son once a week, mowing his yard, and using the computer. He also stated that he would see his girlfriend a few days a week, typically at her house, and they would generally watch a movie or cook dinner together. (Tr., pp. 88–99, 101–04).

Dr. James Reid, a clinical psychologist, testified as a medical expert before the ALJ. He first summarized Hennessey's medical records, discussing the various diagnoses included in those records. (Tr., pp. 104–09). Next, he was asked whether Hennessey met or equaled any listing for the period of September 1, 2007 to June 30, 2008, for the purpose of the Title II determination. Dr. Reid responded

that Hennessey did not meet or medically equal a listing for this time period, but had an impairment of heroin dependence. (Tr., pp. 109–10). Dr. Reid was also asked how he would mark this individual, during the specified Title II time frame, in activities of daily living; maintaining social function; concentration, persistence, and pace; and occurrences of decompensation. Dr. Reid stated that, with drugs, activities of daily living would be mildly impaired; social functioning, moderately impaired; and concentration, persistence, and pace, markedly impaired; with no occurrences of decompensation that meet the required criteria. However, without drugs, activities of daily living would not be impaired; social functioning would be perhaps mildly impaired; concentration, persistence, and pace would be mildly impaired; and there would be no occurrences of decompensation of any duration. (Tr., pp. 111–12). Next, the ALJ asked Dr. Reid whether Hennessey met or equaled any listing from September 1, 2007 to present, for the Title XVI determination. Dr. Reid replied that Hennessey met the criteria for major depression and opioid dependence, but not social phobia. (Tr., 110–11). For this time period, Dr. Reid indicated that, with drugs, activities of daily living would be moderately impaired; social functioning, markedly impaired; concentration, persistence, and pace, markedly impaired; and no documented episodes of decompensation. Without drugs, activities of daily living would not be impaired;

social function, mildly impaired; concentration, persistence, and pace, not impaired; and no episodes of decompensation.  (Tr., p. 112).

When asked whether he considered the migraine headache history as well as the psychiatric diagnoses, Dr. Reid replied that he did; however, he "did wonder whether the headaches were the result of the heroin."  (Tr., pp. 112–13).  Dr. Reid was also asked what authority he relied upon for the conclusion that Hennessey's activities of daily living would be mildly impaired with drugs and not impaired without drugs, during the Title II time frame.  He replied that he relied on the psychiatric review technique completed in October of 2009 as well as Dr. Zhang's assessment of a 60 GAF score in October of 2006.  Moreover, Dr. Reid testified that he relied on his education, experience, and background.  He further noted his experience treating three or four heroin-dependent drug rehabilitation patients during his internship in San Francisco and his background conducting consultative examinations and serving as an expert medical witness for thousands of Social Security claimants, some of whom suffered from heroin dependence.  He also discussed his years of experience as an instructor and as a supervisor for a clinical psychology program of doctoral students treating and evaluating patients. He stated that, in this capacity, he had supervised cases where heroin dependence was an issue and had consulted medical literature when discussing treatment plans with the students.  (Tr., 113–17).

Vocational expert Linda Talley also testified before the ALJ. Talley testified that sandwich maker is classified as medium unskilled work; loan interviewer or mortgage assistant and customer service representative are both sedentary semi-skilled work; bakery sales clerk is medium or light unskilled work; cashier is light unskilled work; and dishwasher and janitor are medium unskilled work. (Tr., 121–24). The ALJ asked Talley to consider a hypothetical individual with Hennessey's education, training, work experience and alleged onset date who had no exertional limitations but must avoid concentrated exposure to noise and could understand, remember, and carry out at least simple instructions for non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace. Talley responded that such an individual could perform past work as a sandwich maker, bakery sales clerk, cashier, dishwasher, or janitor. (Tr., 124–28). The ALJ then added to the first hypothetical that the individual must be able to maintain concentration and attention for two-hour segments over an eight-hour period and must respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent, asking whether these variations would change the jobs Talley previously provided for the first hypothetical. She responded that, based on these variations, she would eliminate the sandwich maker and cashier

positions and would also cut down the number of bakery positions by half, as half would not meet these criteria.  Furthermore, Talley added that this individual could work as a dipper, which is an unskilled position.  (Tr., 128–29).  The ALJ next limited the previous hypothetical such that the individual would not be able to respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; perform repetitive work according to set procedures, sequence, and pace; or perform work at a normal pace, even without production quotas.  Furthermore, the ALJ added that this individual would have three absences per month.  Talley responded that this individual would not be able to perform any jobs without accommodation.  (Tr., 129–30).

### III. *Standard for Determining Disability Under the Social Security Act*

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a),

416.920(a); *see also McCoy v. Astrue,* 648 F.3d 605, 611 (8th Cir.2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity.  If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If so, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

### *Evaluation of Mental Impairments*

The Commissioner has supplemented the familiar five-step sequential

process for evaluating a claimant's eligibility for benefits with additional

regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a.

As relevant here, the procedure requires an ALJ to determine the degree of

functional loss resulting from a mental impairment.  The ALJ considers loss of

function to four capacities deemed essential to work.  20 C.F.R. § 404.1520a(c)(2).

These capacities are:  (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) deterioration or decompensation in

work or work-like settings.  20 C.F.R. § 404.1520a(c)(3).  After considering these

areas of function, the ALJ rates limitations in the first three areas as either:  none;

mild; moderate; marked; or extreme.  The degree of limitation in regard to

episodes of decompensation is determined by application of a four-point scale:

none; one or two; three; or four or more.  *See* 20 C.F.R. § 404.1520a(c)(4).

### *Evaluation of Substance Use Disorder*

Even if an applicant would otherwise qualify as disabled, an "individual

shall not be considered disabled for purposes of this title if alcoholism or drug

addiction would (but for this subparagraph) be a contributing factor material to the

Commissioner's determination that the individual is disabled."  42 U.S.C. §

423(d)(2)(C) (regarding disability insurance benefits); *see also* 42 U.S.C. §

1382c(a)(3)(J) (regarding supplemental security income). "In the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability." *Kluesner v. Astrue,* 607 F.3d 533, 537 (8th Cir.2010). "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse." *Id.* "When a claimant is actively abusing drugs, this inquiry is necessarily hypothetical, and thus more difficult than if the claimant had stopped." *Id.* "The claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor." *Id.*

## IV. *The ALJ's Decision*

### *ALJ Decision Dated October 29, 2010*

The ALJ first determined that Hennessey met the insured status requirements throughout the period of alleged disability and that he had not engaged in any substantial gainful activity since the onset date.

At the second step, the ALJ determined that Hennessey had the severe impairments of migraines, major depressive disorder, and opiate dependence.

Considering the four functional areas as required in cases where a claimant alleges a mental impairment, the ALJ found that Hennessey had mild limitations in activities of daily living, moderate limitations in the areas of social functioning and concentration, persistence, or pace, and no episodes of decompensation.

Proceeding to the third step, the ALJ determined that none of Hennessey's impairments met or medically equaled a listing.

At step four, the ALJ found that, based on all of the impairments, including the substance use disorder, Hennessey had the RFC to perform a full range of work at all exertional levels, except that he must avoid concentrated exposure to noise. Furthermore, the ALJ found that Hennessey retained the ability to understand, remember, and carry out at least simple instructions and non-detailed tasks; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace. The ALJ also noted that, because of Hennessey's continued use of opiates, he could be expected to be absent from work at least three times per month, which would preclude him from all sustained, competitive employment as no employer would tolerate such absences. However, the ALJ found that, absent the use of opiates, Hennessey would be able to demonstrate the reliable attendance and adherence to a schedule expected in competitive employment.

The ALJ based his RFC findings, in part, on Hennessey's testimony at the hearing regarding his longstanding history of migraines and depression, history of heroin use, college attendance, and daily activities, which mostly consisted of lying in bed and watching television.

The ALJ also cited to several of Hennessey's medical records in support of his RFC finding. He considered treatment notes from October of 2006, when Hennessey was hospitalized for a suspected overdose on heroin. The ALJ also relied on Hennessey's records from his ongoing psychiatric treatment with Dr. Minchin, his consultative psychological examination with Dr. Moore, his hospitalization at Metropolitan Psychiatric Center, and his psychiatric treatment with Dr. Cologne.

After determining Hennessey's RFC, and relying the vocational expert's testimony, the ALJ found that Hennessey was unable to perform past relevant work. He stated this finding was based on "excessive absenteeism," as Hennessey was expected to have absences from work three times or more each month. (Tr., p. 147).

The ALJ next determined, at step five, that Hennessey could not perform other work in the national economy. He found that Hennessey's ability to perform this work was "impeded by additional limitations from all of the impairments, including the substance use disorder, specifically his anticipated excessive absenteeism." Therefore, a finding of disabled was appropriate. (Tr., pp. 147–48). However, the ALJ next evaluated whether Hennessey's limitations would remain if he stopped the substance use.

Returning to step two, the ALJ found that if Hennessey stopped the substance use, he would continue to have a severe impairment or combination of impairments.

The ALJ also considered the four functional areas as required in cases where a claimant alleges a mental impairment, although this time assuming an absence of substance use. The ALJ found that, under these circumstances, Hennessey would have mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation.

At step three, the ALJ determined that, without the substance use, Hennessey's impairments still did not meet or medically equal a listing. He concluded that, although Hennessey had been treated for migraine headaches, there was no evidence to suggest that these headaches were so severe or frequent as to preclude work activity. Furthermore, Hennessey stated at the hearing that he was only taking over-the-counter Excedrin medication for headaches. The ALJ pointed out that "pain, which can be remedied or controlled with over the counter analgesics normally, will not support a finding of disability." (Tr., p. 148).

The ALJ found, at step four, that if Hennessey stopped the substance use, he would have the RFC to perform a full range of work at all exertional levels, but should avoid concentrated exposure to noise. Further, Hennessey would retain the

ability to understand, remember, and carry out at least simple instructions and non-detailed tasks; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace.

In making the RFC determination, the ALJ considered Hennessey's headache history, as discussed above.

When considering Hennessey's history of depression, the ALJ relied partly on treatment notes from Dr. Minchin, finding that these records "do not suggest an individual who would be precluded from all work activity due to mental health-related symptoms." (Tr., p. 150). Treatment notes from one appointment indicate that Hennessey quit his job, yet was able to maintain "B" grades in his college courses. Dr. Minchin also described Hennessey's condition as "improved" during another appointment, and Hennessey reported that school was "going well." (Tr., p. 151). The ALJ also cited to one instance when Hennessey discontinued a prescribed anti-depressant without consulting his physician, noting, "A claimant who fails to follow prescribed treatment for a remediable condition, which would restore the ability to work, without good reason, is not under a disability." (Tr., p. 151).

The ALJ also relied on treatment notes from Hennessey's hospitalization at Metropolitan Psychiatric Center in April of 2010. His treatment at this facility was said to have been "complicated by his heavy drug use, mainly heroin," which

suggested that his drug use was considered to be playing an integral role in causing his symptoms, in the ALJ's opinion. (Tr., p. 151). The physicians noted significant improvements in Hennessey's depressive symptoms during his hospitalization, with complete resolution of his suicidal ideations. Furthermore, Hennessey was observed to be exaggerating his depressive symptoms when interacting with physicians and psychologists, but it was noted that his affect was generally euthymic during his stay at the facility. The ALJ found that these observations suggest Hennessey may at times overstate his symptoms. In addition, the ALJ noted that Hennessey's symptoms improved readily with appropriate treatment and "enforced abstinence" from heroin, indicating that his symptoms would not be so severe as to preclude work activity if he were to remain abstinent from heroin use. (Tr., p. 151). Treatment notes from Hennessey's hospitalization at this facility also reveal that, at one point, he was found to be "stacking" his pain medications and admitted he was planning to collect them and use them to get high. The ALJ stated, "Such apparent drug-seeking behavior detracts greatly from the claimant's overall credibility." (Tr., p. 151). Moreover, according to the ALJ, Hennessey bears the burden of proving substance use is not a contributing factor material to the claimed disability.

In further support of the RFC finding, the ALJ found that Hennessey's daily activities also provide evidence that he is capable of functioning at a level that

would not preclude sustained work activity.  Hennessey testified at the first hearing that he still took care of his infant son at times and also reported to Dr. Minchin in August of 2009 that he was caring for his son thirty to forty hours weekly. Furthermore, in a function report dated July 23, 2009, Hennessey indicated that he mowed his backyard each week, drove himself as needed, and used computers "often" as a hobby.  Hennessey also maintained at least passing grades in his college classes.  The ALJ noted, additionally, that a third party report suggested that Hennessey had capabilities beyond those alleged, including preparing his own meals, seeing friends, reading, and playing Frisbee.

Further, the ALJ considered the Missouri State Agency reviewers' opinions in determining Hennessey's RFC, finding them generally consistent with his decision and the record as a whole.

Regarding Hennessey's credibility, the ALJ found that that, if Hennessey stopped the substance use, his medically determinable impairments could reasonably be expected to produce some of the alleged symptoms; however, Hennessey's statements concerning the intensity, persistence, and limiting effects of these symptoms "are not entirely credible."  (Tr., p. 150).

The ALJ next found that, based on the vocational expert's testimony, if Hennessey stopped the substance use he would be able to perform past relevant

work as a cashier and a sandwich maker. Therefore, the ALJ found that Hennessey is not disabled.

Because Hennessey would not be disabled if he stopped the substance use, the ALJ found, his substance use disorder is a contributing factor material to the determination of disability.

### *Appeals Council Order of Remand Dated December 27, 2011*

The Appeals Council vacated the ALJ's decision and remanded the case for further determinations regarding Hennessey's difficulties in social functioning. The Council noted that medical evidence shows Hennessey has an "anxiety disorder manifested by social phobia and distrust." (Tr., p. 161). Because the ALJ did not identify any limitations resulting from Hennessey's social functioning, the Appeals Council found the RFC evaluation to be inadequate. Therefore, the order required the ALJ to further consider Hennessey's maximum RFC, taking into account limitations resulting from Hennessey's difficulties in social functioning. The order moreover instructed the ALJ to obtain supplemental evidence from a vocational expert to clarify the effect of these limitations on Hennessey's occupational base.

### *ALJ Decision Dated July 27, 2012*

The ALJ first determined that Hennessey met the insured status requirements through June 30, 2008 and that he had not engaged in substantial gainful activity since the onset date.

At step two, the ALJ determined that Hennessey had the severe impairments of migraine headaches, major depression, and opiate dependence.

Next, the ALJ considered the four functional areas as required in cases where the claimant alleges a mental impairment. He found Hennessey had moderate restrictions in activities of daily living, marked difficulties in social functioning and concentration, persistence, or pace, and repeated episodes of decompensation. In support of these findings, the ALJ noted that Hennessey could not often take care of his personal care or meal preparation; would hardly ever go outside; had become antisocial; reported a poor ability to develop and maintain relationships; and alleged difficulties with memory, concentration, and completing tasks. Furthermore, Hennessey had experienced one or two episodes of decompensation considering the effects of substance use. On the other hand, the ALJ considered that Hennessey could still engage in activities such as driving and going out alone; would often present for examinations on time, clean, appropriately dressed, and well-kempt; reported no problems getting along with others; could follow instructions, handle stress, and deal with changes "well enough"; and,

according to treatment notes, presented at appointments with normal speech and intact thought processes, memory, and general fund of knowledge.

Based on the above considerations, the ALJ found at step three that Hennessey's impairments, including the substance use disorder, met sections 12.04 and 12.09 of 20 C.F.R., Part 404, Subpart P, Appendix 1.

The ALJ thereafter returned to step two to determine whether Hennessey's limitations would remain if he stopped the substance use. The ALJ found that, if Hennessey stopped the substance use, he would continue to have a severe impairment or combination of impairments.

The ALJ again considered the four relevant functional areas, concluding that if Hennessey stopped the substance use, he would have mild restrictions in activities of daily living, moderate difficulties in social functioning and in concentration, persistence, or pace, and no episodes of decompensation of extended duration. In support of this finding, the ALJ noted that Hennessey's allegations were less credible when the effects of substance use are not considered. Specifically, Hennessey's allegations regarding lack of motivation, not spending time with others, limited sleep, and difficulties with memory, concentration, and completing tasks, were found to be less credible without consideration of ongoing substance use. The ALJ pointed out that during periods of alleged abstinence, Hennessey presented as pleasant and calm; his mood was "much better"; his affect

was euthymic; his thoughts were logical, sequential, and goal-directed; his memory was good; and he was cooperative and able to answer all questions. Furthermore, Hennessey reported using a computer and spending time with his girlfriend eating dinner or watching movies.

At the third step, the ALJ determined if Hennessey stopped the substance use, none of his impairments would meet or medically equal a listing.

At step four, the ALJ found that if Hennessey stopped the substance use, he would have the RFC to perform a full range of work at all exertional levels, but should avoid concentrated exposure to noise. Moreover, he could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight-hour period; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace.

In making the RFC finding, the ALJ first considered Hennessey's alleged inability to work because of headaches and depression. The ALJ noted that, according to Hennessey, his headaches cause pain, vomiting, and diarrhea; incapacitate him; keep him from sustaining a regular schedule or work hours; and cause him difficulty in concentration and completing tasks. Although

Hennessey's friend and mother corroborated these allegations, the ALJ attributed little weight to these individuals' and Hennessey's social worker's claims. None of these individuals were acceptable medical sources and the ALJ found their statements to stand in sharp contrast to the overall record and objective findings, when not considering the effects of substance use.

Although the ALJ gave Hennessey the benefit of the doubt regarding his functional limitations, he found that Hennessey's allegations regarding his symptoms and limitations without the effects of substance use were "generally inconsistent and unpersuasive." (Tr., p. 16). The ALJ based this credibility finding a variety of factors, including the conservative nature of Hennessey's treatment, the lack of any medical advice to refrain from working, indications that Hennessey is able to care for himself and his son, Hennessey's ability to drive and spend time with friends and girlfriends, and Hennessey's failure to report to doctors the significant headache symptoms alleged at his hearing, such as pain, vomiting, diarrhea, and incapacitation. The ALJ also noted that Hennessey worked only sporadically before his alleged onset date with inconsistent and often low earnings. Furthermore, Hennessey worked after his alleged onset date, indicating that he may have greater capabilities than has claimed. These issues, according to the ALJ, when combined with the medical evidence, raise some doubt as to Hennessey's credibility. Specifically, this information calls into question

Hennessey's motivation to work and also raises doubt as to whether his unemployment is the result of medical impairments. Another factor in the ALJ's credibility analysis was the fact that Hennessey has an extensive history of substance dependence and relapse, and thus his current sobriety allegations were not considered credible. The ALJ found that, during periods of compliance and abstention from substance use, Hennessey showed improvement in his symptoms. Finally, the ALJ found that Hennessey exhibited "extensive noncompliance with his treatment," citing to treatment notes for support that Hennessey would relapse on heroin, discontinue medications without permission, take more medication than prescribed, take medications prescribed to others, get medications off the street, let medications run out, and fail to attend group meetings for his substance use. (Tr., p. 18).

The ALJ also gave little weight to Dr. Moore's evaluation and to the psychiatric review technique completed by Dr. DeVore in making his RFC findings. According to the ALJ, Dr. Moore's evaluation was inconsistent, as it failed to diagnose a substance use disorder although Hennessey reported past addiction. Furthermore, Dr. Moore did not have a treating relationship with Hennessey. Similarly, Dr. Devore did not examine Hennessey or hear his testimony, and additional evidence was added after he formed his opinion.

Dr. Reid's testimony was accorded significant weight by the ALJ, as his opinions were found to be supported by explanation and medical evidence and to reflect considerations by a specialist familiar with Social Security regulations. The ALJ noted that Hennessey's counsel objected to Reid's testimony on the ground that he failed to offer specific, supporting authority for his conclusion that substance use was material. Hennessey's counsel argued that, without such authority, Dr. Reid's opinion lacked adequate legal foundation and thus was not entitled to consideration as substantial evidence. However, the ALJ overruled this objection and denied the request for a specific list of authorities relied on by Dr. Reid. He found that there was more than an adequate basis and foundation for Dr. Reid's opinion, as he relied on his education, experience, and background, which included work with drug rehabilitation patients, and also "provided detailed testimony citing exhibits and page numbers relied upon in forming his opinions." (Tr., pp. 18–19). Moreover, Hennessey's counsel stipulated to Dr. Reid's qualifications as an expert.

At step four, the ALJ found that if Hennessey stopped the substance use, he would be unable to perform past relevant work.

Next, at the fifth step, the ALJ determined that if Hennessey stopped the substance use, considering his age, work experience, and RFC, there would be a significant number of jobs in the national economy that he could perform. The

ALJ based this finding on the vocational expert's testimony that an individual with Hennessey's limitations could work as a pastry baker, dishwasher, and dipper. Therefore, because Hennessey could make successful adjustments to this work, which exists in significant numbers in the national economy, the ALJ found that Hennessey was not disabled.

Because Hennessey would not be disabled if he stopped the substance use, the ALJ found Hennessey's substance use disorder to be a contributing factor material to the determination of disability.

## V. *Standard of Review*

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Rucker for Rucker v. Apfel,* 141 F.3d 1256, 1259 (8th Cir.1998). "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.* When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart,* 417 F.3d 922, 928 (8th Cir.2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.,* 957 F.2d 581, 585–86 (8th Cir.1992).

## VI. *Discussion*

### A. *The ALJ's RFC Findings Are Supported by Sufficient Medical Evidence*
### *Ability to Perform Light Activities*

Hennessey contends that his ability perform sporadic, light activities does not support the ALJ's RFC finding, which is based on a full time work schedule. Although Hennessey's "ability to do activities such as light housework and visiting with friends" does not, by itself, support a finding that he can engage in full-time, competitive work, *Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir.1998), the ALJ relied on more than these abilities in determining Hennessey's RFC and assessing his credibility. For example, the ALJ found that Hennessey was able to drive, go out alone, shop for clothes and food, use a computer, and spend time with his son.

*Medhaug v. Astrue,* 578 F.3d 805, 817 (8th Cir.2009) (activities such as shopping and driving are inconsistent with complaints of disabling pain and detract from plaintiff's credibility). The record indicates, moreover, that Hennessey was able to do these activities regularly. *Cf. Burress,* 141 F.3d at 881 (finding it significant that a plaintiff was only able to do light housework *occasionally*). Furthermore, the ALJ indicated that the fact Hennessey worked after his alleged onset date was relevant when considering his true capabilities. *Smith v. Colvin,* 756 F.3d 621, 626 (8th Cir.2014) (considering work after a plaintiff's alleged onset date a relevant factor in the ALJ's credibility determination).

### Failure to Follow a Course of Treatment

A second argument presented was that, in discussing Hennessey's failure to follow a course of treatment, the ALJ failed to conduct an inquiry into the circumstances surrounding this failure and determine whether this treatment would restore the ability to work or sufficiently improve the condition. However, such an inquiry is not required in this case, as Hennessey was not denied benefits for failure to follow a course of treatment; instead, this failure merely factored into the ALJ's credibility determination and RFC assessment. *See Burnside v. Apfel,* 223 F.3d 840, 844 (8th Cir.2000) (noting that this inquiry must be conducted before a plaintiff is *denied benefits* for failure to follow a course of treatment). This analysis is also unnecessary because Hennessey's ability to comply with treatment

was not in dispute. *Cf. Kirby v. Sullivan,* 923 F.2d 1323, 1328 (8th Cir.1991) (requiring ALJ to determine plaintiff's subjective ability to comply with prescribed treatment regimens given the fact that plaintiff suffered from borderline intelligence and memory impairment). Specifically, the record does not indicate that Hennessey has any physical, mental, educational, or linguistic limitations such that his failure to follow treatment is acceptable. 20 § C.F.R. 416.930(c) (listing these as acceptable reasons for failure to follow prescribed treatment).

The ALJ considered both Hennessey's failure to abstain from substance use and his failure to comply with other medication and treatment instructions in finding that, without consideration of the effects of substance use, Hennessey's allegations "are generally inconsistent and unpersuasive." *Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir.2005) ("A failure to follow a recommended course of treatment…weighs against a claimant's credibility").

Regarding Hennessey's failure to abstain from substance use, the ALJ noted that Hennessey had used heroin frequently for several years; experienced withdrawal symptoms after stopping heroin use; gone through substance abuse treatment; maintained alleged periods of sobriety; relapsed repeatedly; and overdosed on heroin at least once, in 2006, although Hennessey denied any past overdosing. The ALJ also discussed Hennessey's alcohol and marijuana use and his attempt during a hospital stay to "stack" his medications and use them

collectively to get high. Though medical providers have advised Hennessey that his medications would have a reduced effect with continued substance use, and have repeatedly instructed him to discontinue substance use altogether, Hennessey has continued to relapse. All of these considerations led the ALJ to determine that Hennessey's current allegations of abstention from substance use were not credible; a determination that factored into his RFC assessment.

Next, the ALJ considered Hennessey's failure to comply with other medication and treatment instructions. Specifically, the ALJ mentioned that Hennessey had taken himself off of medications without consulting his physicians, taken more medications than prescribed, taken medications prescribed to someone else, gotten medications off of the street, let medications run out, and failed to attend NA meetings. These compliance issues also factored into the ALJ's credibility and RFC determinations.

Failure to follow a course of treatment was only one factor the ALJ relied upon when assessing Hennessey's credibility and comparing his allegations to the record as a whole. Because this is a proper consideration when assessing credibility, and because the ALJ provided sufficient reasons for discrediting Hennessey's allegations on this basis, the ALJ appropriately considered this factor in making his credibility determination. *See Buckner v. Astrue,* 646 F.3d 549 (8th

Cir.2011) (noting that courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so).

## *Improvement with Treatment*

Hennessey next argues that the ALJ did not cite any evidence that his condition improved with treatment. However, the ALJ in fact cited to two pieces of evidence to support his finding that Hennessey's symptoms improved with treatment compliance, including abstention from substance use. First, the ALJ cited to a treatment note from an appointment with Dr. Ahmed in May of 2012. At that time, Hennessey reported that he was "doing okay" and that he had experienced one "good week" with increased medication and three weeks of sobriety. (Tr., p. 641). The ALJ also cited to records from Hennessey's inpatient hospital stay at Metropolitan Psychiatric Center during April of 2010. With treatment and sobriety, there was "significant improvement" observed regarding Hennessey's depressive symptoms, including complete resolution of his suicidal ideations and "significant improvement" in his affect, with euthymic affect observed most of the time. The physicians further noted that, upon discharge, Hennessey was calm, cooperative, well groomed, able to answer all questions, pleasant, alert, and oriented, with a "much better" mood and a "euthymic, full range, stable" affect. Additionally, Hennessey's thoughts were logical, sequential, and goal-directed and he showed good future planning. During his stay at

Metropolitan Psychiatric Center, Hennessey was also noted to be exaggerating his symptoms during interactions with the physicians, but "vocal, verbal, and laughing" with other residents in the hospital. (Tr., p. 560).

The ALJ only relied on this medical evidence as a factor in assessing Hennessey's credibility. *Renstrom v. Astrue,* 680 F.3d 1057, 1066 (8th Cir.2012) (considering plaintiff's improvement with treatment as a factor in credibility determination). Because the ALJ provided support for his finding and sufficiently justified his reliance on this factor in discrediting Hennessey's allegations, I defer to his judgment. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir.2000) (if adequately explained and supported, credibility findings are for the ALJ to make).

Hennessey also argues that, in contrast to the ALJ's finding that his symptoms improved with treatment, those who interact with him most, his mother and social worker, indicated that his functioning actually did not improve with treatment compliance and sobriety. The ALJ assessed these individuals' testimonies limited weight because they are not acceptable medical sources and, according to the ALJ, their statements "stand in sharp contrast to the overall record and objective findings when not considering the effects of substance use."

The ALJ's finding that Hennessey's mother and social worker's allegations are entitled to limited weight is consistent with Social Security Ruling 06-03p. This ruling clarifies that the weight attributed to "other sources," which includes

both parents and social workers, depends on the particular facts of the case, the source of the opinion, and the issues the opinion is about, as well as other factors. SSR 06-03p, 71 Fed. Reg. 45593 (Aug. 9, 2006). The facts of this case are indeed unique. Because there is medical evidence of a substance use disorder, the ALJ must make additional findings about whether this disorder is material to the determination of disability and the extent to which any limitations would remain absent the substance use. Moreover, the issues discussed during Hennessey's mother and social worker's testimonies further complicated the ALJ's task of separating Hennessey's limitations from his ongoing substance use. Though both of these individuals indicated they believed Hennessey had serious impairments and various difficulties in functioning, these assertions were intertwined with discussions of Hennessey's substance use. Furthermore, Hennessey's social worker could not confirm whether Hennessey ever tested positive for heroin and his mother was unsure whether he was still using drugs. Especially in light of these unique circumstances, I find that the ALJ's decision to afford these testimonies little weight is supported by substantial evidence.

### *Medical Expert's Testimony*

Hennessey again challenges Dr. Reid's testimony, asserting that the medical expert who testified at his hearing does not have an extensive background or experience sufficient enough to overcome the lack of foundation for his opinion.

Hennessey's counsel's objection to Dr. Reid's testimony at the hearing was overruled by the ALJ, who found more than an adequate basis and foundation for Dr. Reid's opinion.

The ALJ found that Dr. Reid's opinions were supported by explanation and medical evidence. Furthermore, the ALJ noted that Dr. Reid was not required to rely on any specific, supporting authority in concluding that substance use was material. On the contrary, his education, experience, and background, paired with his detailed testimony regarding Hennessey's medical records, amounted to a sufficient foundation on which to base his conclusions. The ALJ, moreover, pointed out that Hennessey's counsel stipulated to Dr. Reid's qualifications as an expert at the hearing.

Because Dr. Reid possesses adequate qualifications and his conclusions are consistent with the record as a whole, I reject Hennessey's challenge to his testimony. First, Dr. Reid's opinion regarding Hennessey's limitations in activities of daily living without the effects of substance use did not lack an adequate foundation. He based this conclusion on his review of the record, and particularly Hennessey's medical records, explicitly citing to two of those treatment notes. *Cf. Finch v. Astrue,* 547 F.3d 933, 936 (8th Cir.2008) (the conclusions of medical experts may be rejected when they are inconsistent with the record as a whole). The ALJ noted that Dr. Reid "provided detailed testimony citing exhibits and page

numbers relied upon in forming his opinions." Moreover, Dr. Reid also properly relied on his education, experience, and background in forming his opinions, as his qualifications are more than adequate. Dr. Reid is a psychologist who also has experience in the area of substance use. He has treated heroin-dependent drug rehabilitation patients, served as a medical witness for Social Security claimants who suffered from heroin dependence, acted as an instructor and supervisor for doctoral students who have assessed patients with heroin dependence, and relied on medical literature regarding substance use in his role as an instructor. *See Harvey v. Barnhart,* 368 F.3d 1013, 1016 (8th Cir.2004) (noting that an internist physician possessed adequate qualifications by virtue of her education and experience to make mental health findings because she had received psychiatric training and had treated patients with psychological issues).

### *The ALJ's RFC Findings*

Hennessey further alleges that, assuming Dr. Reid's testimony is legally sufficient, the ALJ's RFC findings are still not supported by "some" medical evidence. He, first, argues that this requirement is not met because Dr. Reid did not testify to the limitations as found in the decision and, second, because there is no medical opinion that is synonymous with the RFC findings contained in the decision.

Residual functional capacity "is the most [a person] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545, 416.945. Although the ALJ must determine a claimant's RFC "based on all relevant evidence," *Roberts v. Apfel,* 222 F.3d 466, 469 (8th Cir.2000), the RFC is a medical question. Therefore some medical evidence must support the determination of the claimant's RFC. *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001). An ALJ "should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.* (internal quotation omitted). However, although an ALJ must determine a claimant's RFC based upon all relevant evidence, the claimant bears the burden of establishing his RFC. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

Here, substantial evidence supported the ALJ's determination of Hennessey's RFC. The ALJ found that if Hennessey stopped the substance use, he would have the RFC to perform a full range of work at all exertional levels, except he must avoid concentrated exposure to noise. Moreover, he could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight-hour period; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, and pace. The ALJ properly considered and weighed the available medical

evidence as well as Hennessey's testimony.  Therefore, I reject Hennessey's argument that the ALJ's RFC findings are not supported by any medical evidence.

In this case, the ALJ had the difficult task of determining Hennessey's RFC without the effects of substance use.  Ultimately, the ALJ found that there were still severe impairments that cause functional limitations, even without the effects of substance use, but nonetheless that Hennessey retains the capacity to perform activities within the RFC detailed above.

Before making his RFC determination, the ALJ engaged in an extensive credibility analysis.  After considering all the evidence, the ALJ accepted Hennessey's subjective allegations regarding his functional limitations in general, but to some extent discredited Hennessey's allegations when considering RFC without the effects of substance use.

In analyzing Hennessey's credibility, the ALJ first pointed out that the medical evidence as a whole demonstrates that Hennessey's treatment was conservative in nature.  His conditions did not require frequent hospitalizations and were treated primarily through medication management and routine, follow-up appointments.  Moreover, the treatment notes contain no ongoing recommendations for more aggressive treatment and no indications that Hennessey is unable to work or engage in other activities.   The ALJ next discussed Hennessey's migraines, finding that he had generally failed to report to his

providers the significant symptoms alleged at the hearing. For instance, Hennessey failed to report vomiting, diarrhea, and complete incapacity such that he must rest in a dark room, which he claims result from his migraine headaches. Nonetheless, the ALJ cited to a treating physician's diagnosis of migraine headaches and explicitly stated that he considered this diagnosis in formulating Hennessey's RFC. The credibility assessment also cited medical evidence regarding Hennessey's substance use, which indicated long-term use of heroin, withdrawal episodes, participation in substance abuse treatment, periods of sobriety, numerous relapses, and overdose. Notably, this evidence also reveals that Hennessey was repeatedly advised by his medical providers to maintain sobriety, and was also informed that his prescribed medications would be less effective with continued drug use. Regardless, however, Hennessey continually relapsed and, likewise, failed to comply with other treatment instructions as well. The ALJ cited multiple treatment notes revealing that Hennessey had taken himself off medications without consulting a physician, taken more medication than prescribed, obtained medications off the street, let medications run out, and failed to attend NA meetings. A final factor in the ALJ's credibility determination was the fact that Hennessey's symptoms improved during periods of treatment compliance and sobriety. At least two medical records explicitly support this conclusion, while most others are vague at best regarding the correlation between Hennessey's

condition and his compliance. These factors were properly considered and ultimately led to the ALJ's conclusion, which is supported by substantial evidence, that Hennessey's allegations were not entirely credible.

The ALJ's assessment of Hennessey's credibility, including the medical evidence discussed therein, certainly contributed to his RFC determination. *Wildman v. Astrue,* 596 F.3d 959, 969 (8th Cir.2010) (indicating that an ALJ's RFC findings were properly influenced by conclusions about the plaintiff's credibility). Specifically, this evidence support's the ALJ's determination that Hennessey has a higher RFC without the effects of substance use, a finding that Hennessey appears to dispute. Because Hennessey was found to lack credibility, and perhaps because the treatment notes did not contain enough clarity regarding the affect of substance use on Hennessey's conditions, the ALJ obtained a medical expert, Dr. Reid, to testify at the hearing. Even without the medical expert's testimony, however, the abundant medical evidence relied upon in the credibility analysis, which was embedded in the ALJ's RFC determination, would likely satisfy the low burden of "some" medical evidence.

Granting the medical expert's testimony significant weight, and relying on it as medical evidence, was not error. The ALJ accorded Dr. Reid's opinions significant weight, finding that they were persuasive, supported by explanation and by the medical evidence, and reflected considerations of the medical record by a

specialist who is familiar with Social Security regulations. Dr. Reid found that Hennessey's substance use was material to the determination of disability and also provided a clear opinion regarding the limitations that would remain absent any substance use. The ALJ's reliance on these opinions was appropriate, especially given the fact that other medical evidence in the record did not sufficiently clarify whether Hennessey was higher functioning without drugs, although two treatment notes did suggest that this was true. Furthermore, in assessing Hennessey's RFC, the ALJ was required to obtain medical evidence that addresses his ability to function in the workplace. *Wildman,* 596 F.3d at 969. Because none of Hennessey's treating physicians limited his ability to work in general or made unambiguous findings about his ability to function in the workplace without the effects of substance use, Dr. Reid's testimony was particularly helpful in this regard. Dr. Reid also had the opportunity to examine the entire record and listen to Hennessey's testimony. For these several reasons, Dr. Reid's opinions alone would likely amount to "some" medical evidence on which an RFC finding could be based. However, the ALJ did not consider this testimony in isolation, but in the context of the record as a whole, including treating physicians' notes and Hennessey's partially credible testimony. *See Harvey v. Barnhart,* 368 F.3d 1013, 1016 (8th Cir.2004) (generally a non-examining, consulting physician's opinions do not constitute "substantial evidence" alone, but do satisfy this standard when

considered as part of the record as a whole, which clearly provides substantial support for an ALJ's RFC findings). Thus, substantial evidence supports the ALJ's RFC determination, including at least "some" medical evidence.

Contrary to Hennessey's argument, there is no requirement that the RFC must explicitly match limitations described in a medical opinion or a medical expert's testimony. While an ALJ must consider "some" medical evidence and did so here, as discussed above, he need not consider it exclusively. *Cox v. Astrue,* 495 F.3d 614, 619–20 (8th Cir.2007) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") Rather, he should consider all the evidence in the record, including medical records, observations of treating physicians and others, and Hennessey's own allegations, to the extent they are credible. *See Stormo v. Barnhart,* 377 F.3d 801, 807 (8th Cir.2004). Here, it appears the ALJ appropriately took into account Hennessey's limitations as evidenced in the record, disregarding the effects of substance use. For instance, he limited contact with others to "casual and infrequent," to reflect Hennessey's difficulties in social functioning. He also excluded concentrated exposure to noise, thus acknowledging Hennessey's history of migraine headaches. Moreover, the ALJ apparently took into account the history of depression, which causes low mood and fatigue, by limiting Hennessey's RFC to simple, non-detailed, repetitive work.

There is also plenty of evidence in the record to explain the ALJ's decision not to reduce Hennessey's RFC to an even lower level. One such example is the third party description of Hennessey's daily activities. This report indicated that Hennessey watches television and sleeps most of the day, but also reads, uses the computer, mows the yard, does dishes, cleans around the house, prepares simple meals and drives. Additionally, the record shows that Hennessey worked periodically throughout his alleged disability, demonstrating that he is able to function in the workplace at least to some degree. Further, no physician limited his ability to work. Hennessey's symptoms and the effectiveness of his medications were also complicated by his drug use, according to his physicians. Two physicians even noted significant improvements in his condition when he complied with treatment and maintained his sobriety. Likewise, Dr. Reid testified that Hennessey's functioning would be higher without the effects of substance use. Throughout the course of his treatment, Hennessey was also assessed several GAF scores by various physicians, nearly all of which fell within the 50 to 60 range, indicating "moderate" symptoms. However, it is significant that most, if not all, of those scores were influenced by Hennessey's heroin use. Therefore, they may have been used for support that Hennessey would have a higher RFC without the effects of substance use. In light of the evidence supporting the ALJ's determination, there is no basis for finding that he substituted his own opinion for

those of the medical experts in determining that Hennessey still retains the RFC stated.  He relied on medical experts, testimony, and other evidence in the record to separate out the limitations that would remain in the absence of substance use, and there was substantial evidence to support his findings.

### Social Worker's Testimony

Hennessey next contends that the ALJ did not attribute any weight to social worker Brad Peters' testimony, which amounted to error.  He argues that Peters is a more experienced resource than Dr. Reid in the area of coexisting mental disorders and substance abuse.  In particular, he believes that the court should have relied upon Peters' statement that he had observed no difference between Hennessey's symptoms with and without substance use.

Although Hennessey alleges that Peters' testimony was not given *any* weight by the ALJ, in fact, it was assessed *limited weight* for the stated reasons that Peters is not an acceptable medical source and his statements "stand in sharp contrast to the overall record and objective findings when not considering the effects of substance use."  (Tr., p. 16).   Because Peters is not an acceptable medical source, the ALJ has "more discretion" in determining what weight to give his testimony. *Raney v. Barnhart,* 396 F.3d 1007, 1010 (8th Cir.2005).  Here, the ALJ found that Peters' statements were contradictory to the record as a whole when substance use is removed from consideration.  *Hacker v. Barnhart,* 459 F.3d 934, 937 (8th

Cir.2006) (an ALJ may "diminish or eliminate" the weight given to such an opinion when it is inconsistent with the record).

As the ALJ pointed out, there were in fact many inconsistencies between Peters' testimony and the record as a whole. First, Peters testified that he had observed Hennessey suffering from extreme depression since July of 2010. However, other evidence in the record, including Hennessey's own testimony, establishes that he was using heroin frequently throughout this period. Hennessey's medical providers indicated that such drug use can worsen his depression and make his medications ineffective. Another inconsistency is that, while Peters alluded to Hennessey's recent heroin use, he could not confirm or deny it. For example, Peters compared Hennessey's behavior when he is going through withdrawal to when he is using "whatever substance." (Tr., p. 79). Yet, when asked about Hennessey's drug screens, Peters responded that marijuana was the "main one" for which Hennessey had tested positive and that he could not verify if there was ever a positive test for heroin, or even how long heroin generally stays in a person's system. (Tr., p. 80). These statements are contradictory to Peters' discussion of Hennessey's withdrawal periods, as withdrawal does not generally result from ending marijuana use. A third inconsistency is that Peters claims to have observed "no difference" between Hennessey's condition when he is "claiming" to go through withdrawal and when he is using "whatever substance."

(Tr., p. 79). This, again, conflicts with Peters' uncertainty about what substances Hennessey was using, whether he tested positive for heroin, and how long heroin typically remains in the system. Moreover, treating physicians noted improvements in Hennessey's condition when he was sober and compliant with medication. Dr. Reid's opinion also suggested such a result. A final inconsistency in Peters' testimony becomes apparent when compared to Hennessey's mother Isolde's testimony. While Peters explained that he observed no difference in Hennessey's aggressive behavior during substance use and withdrawal, Isolde described a difference in behavior from withdrawal to early sobriety. While she noted "extreme, extreme aggressive behavior" during withdrawal from substance dependence, she noted no such behavior just after this period and stated that Hennessey was instead weak and sick.

It is the ALJ's duty to resolve conflicts in the evidence, *Hacker,* 459 F.3d at 936, and also his prerogative to exercise discretion in considering the amount of weight to give a non-acceptable medical source's opinion. Based on the many inconsistencies between Peters' testimony and the record as a whole, there is substantial evidence to support the ALJ's decision to assess limited weight to this testimony.

**B.** *The Hypothetical Question Posed to the Vocational Expert Was Proper*

Hennessey alleges that the hypothetical question posed to the vocational expert, Linda Talley, did not capture the concrete consequences of his impairment. Therefore, he argues that Talley's conclusion, that there are a significant number of jobs in the national economy that he could perform, does not constitute substantial evidence.

The hypothetical question posed to Talley was virtually identical to the ALJ's determination of Hennessey's RFC without the effects of substance use. The ALJ included in the hypothetical question those limitations found in the RFC determination to exist in the absence of substance use. *Pearsall v. Massanari,* 274 F.3d 1211, 1220 (8th Cir.2001) (concluding that the hypothetical question was proper because it included all impairments accepted as true by the ALJ and excluded those impairments the ALJ had reason to discredit). Hennessey does not specifically state why he believes the hypothetical question is inadequate, or what additional limitations should have been included, but instead essentially reiterates his argument that the ALJ's RFC finding is not supported by sufficient evidence. *Fastner v. Barnhart,* 324 F.3d 981, 987 (8th Cir.2003) (finding RFC used in hypothetical question and vocational expert's response were supported by substantial evidence where plaintiff merely reiterated his challenge to the RFC determination, which was already found to be satisfactory). Because the ALJ's

RFC findings are supported by substantial evidence and the hypothetical question included all of Hennessey's limitations set forth by the ALJ in the RFC determination, the hypothetical question was also supported by substantial evidence. *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir.2006).

The hypothetical question posed to the vocational expert was thus proper, and as a result her testimony that there were a significant number of jobs that Hennessey could perform if he stopped the substance use constitutes substantial evidence supporting the ALJ's determination that Hennessey was not disabled. *Guilliams v. Barnhart,* 393 F.3d 798, 804 (8th Cir.2005).

## VII. Conclusion

Based on the foregoing, I conclude that there is substantial evidence on the record to support the Commissioner's decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of March, 2015.